SANDERS ET AL., APPELLEES AND CROSS-APPELLANTS, *v.* MT. SINAI HOSPITAL ET AL., APPELLANTS AND CROSS-APPELLEES.

(No. 47898—Decided March 18, 1985.)

*Don C. Iler,* for appellees and cross-appellants.

*Robert C. Maynard,* for appellants and cross-appellees.

MARKUS, P.J. Plaintiffs are a hospital patient, her husband, and her daughter. They seek damages for the patient's injuries, which they claim the defendant hospital and the defendant anesthesia assistant negligently caused during her surgery. The jury rendered verdicts for both defendants, and specifically found in an interrogatory answer that the anesthesia assistant was not negligent. The trial court granted plaintiffs' motion for a new trial because the court concluded (a) it erroneously excluded important evidence, and (b) the jury's verdict was against the weight of the evidence.

Defendants appeal, claiming that the trial court (a) erred and abused its discretion by granting a new trial, (b) gave improper jury instructions in the preceding trial, (c) wrongly suggested that plaintiffs may premise defendants' liability at the new trial on nuisance or failure to obtain informed consent, and (d) erroneously refused to grant defendants' motions for summary judgment and for a directed verdict because the anesthesia assistant was the borrowed servant of a nonparty doctor. The plaintiff daughter cross-appeals, complaining that the court improperly dismissed her claim for the loss of her mother's consortium.

The trial court did not abuse its discretion by granting plaintiffs a new trial based on that court's view of the weight of the evidence. The remaining assignments of error merit no action by this court at this time, so we affirm the new trial order without further instructions.

I

The patient entered the defendant hospital on her gynecologist's recommendation for a diagnostic laparoscopy to investigate the source of her pelvic

pain. The gynecologist scheduled her surgery for the morning of July 5, 1979.

In the evening of July 4, a physician anesthesiologist visited the patient in her hospital room to perform a preanesthesia evaluation. The anesthesiologist was a member of an independent group of physicians who provided all anesthesiology services at the defendant hospital. Plaintiffs had settled their claims against that anesthesiology group for the patient's injuries before the trial against the present defendants.

On July 4, the anesthesiologist found the patient to be a general anesthesia "risk 2," since she was in good health but slightly obese. Apparently, a perfectly normal, healthy individual is usually rated as "risk 1." The patient agreed to have a general anesthetic for her surgery.

The patient arrived in the operating room at approximately 8:10 a.m. on July 5. The nursing staff had sedated her prior to her arrival there. Another physician from the anesthesiologist group was present to supervise the patient's anesthesia that day. The hospital assigned two of its employees to assist the anesthesiologist: (a) a specially trained "anesthesiologist's assistant" who was not a physician or a nurse, and (b) a dental resident who began her hospital residency three days earlier and had never previously participated in surgery or anesthesia. The hospital intended the dental resident to observe and learn about anesthesia.

The physician anesthesiologist had prepared an anesthesia plan for this patient, including the type and amount of medication and anesthesia. He testified that he began inducing anesthesia for the patient at approximately 8:15 a.m. Once the patient was asleep, the anesthesiologist administered a muscle relaxant that paralyzed her voluntary muscles and her diaphragm. After that drug took effect, the patient could not breath without assistance.

The assistant attempted to visualize the patient's vocal chords so she could insert an endotracheal tube. When she could not do so, the anesthesiologist inserted the tube and then listened to the patient's lungs. In that manner, the anesthesiologist made sure that the tube was correctly positioned and that oxygen and anesthesia were reaching both lungs. The anesthesia chart indicates that he successfully intubated the patient by 8:20 a.m.

Although the anesthesiologist did not physically leave the operating room, the assistant monitored the patient's vital signs from 8:20 until approximately 8:45. Monitoring duties included (1) constantly listening with a stethoscope placed near the patient's trachea for the sound of gases being inhaled and exhaled through the endotracheal tube, (2) observing the patient's pulse rate by watching and listening to an electrocardiograph machine, (3) measuring the patient's blood pressure every five minutes, (4) manually ventilating the patient's lungs approximately once every five seconds by squeezing a rubber bag attached to the endotracheal tube, and (4) suctioning mucuous or other obstructions from the endotracheal tube whenever necessary.

The assistant's duties also called for her to mark the patient's pulse and blood pressure on the anesthesia chart at five minute intervals. At 8:15 a.m., the chart shows the patient's pulse was 65 and her blood pressure was approximately 106/65. The chart contains no notation about the patient's pulse or blood pressure between 8:15 and 8:30. At 8:30, the patient's pulse had risen slightly to 90, and her blood pressure was 110/90.

At approximately 8:30, the gynecologist requested that the operating room staff adjust the surgical table to put the patient in a thirty degree Trendelenburg position. They tilted the operating table to a thirty degree angle with the

patient's head downward. The gynecologist then pumped three liters of carbon dioxide through a small incision into the patient's abdomen. By expanding the abdomen he could better view the patient's internal organs. At his direction, the staff turned off the overhead lights, so the lighted scope he inserted through the incision would illuminate the area more effectively. Two "saucer" lights remained on, and one of those lights illuminated the anesthesia monitoring machinery.

At 8:35, the chart shows the patient's blood pressure was 100/65, but it contains no record of her pulse then. The chart provides no further record of the patient's pulse or her blood pressure until 8:45, when her pulse reached 180 and her blood pressure was 210/90.

The anesthesia assistant testified that the patient's pulse and blood pressure were stable and within normal limits at 8:35 when she suctioned the endotracheal tube. She demonstrated for the dental assistant how she ventilated the patient by squeezing the bag, then she let the resident do it. The resident squeezed the bag two or three times and reported that the bag seemed hard to squeeze. The assistant said she took the bag from the resident and noticed its increased resistance when she attempted to squeeze it. She called for assistance from the nearby anesthesiologist.

The anesthesiologist testified that the assistant called him over at approximately 8:45. He noticed increased resistance when he squeezed the ventilating bag. He suctioned the endotracheal tube. The bag did not return to normal compliancy, so he removed the tube and ventilated the patient by using a mask with one hundred percent oxygen. The anesthesia record indicates that the patient's blood pressure was 190/90 at 8:47 or 8:48 and 180/100 at 8:50. By 8:55, the blood pressure had returned to normal limits at 120/70. The anesthesiologist reinserted the en-

dotracheal tube at approximately 8:55. The anesthesiologist, the assistant, and the dental resident all testified that the remainder of the surgery was uneventful and ended at 10:15 a.m.

The hospital staff moved the patient to the recovery room after her surgery. Although she could breath on her own, she did not awaken from the anesthesia in the usual time. The anesthesia assistant told a surgical nurse that the patient's difficulties came from a problem with the endotracheal tube or the airway for an uncertain interval. The anesthesiologist consulted with the hospital's chief of neurology who later diagnosed the patient's condition as delayed hypoxic encephalopathy, or brain damage from oxygen starvation.

The hospital discharged the patient to a nursing home six months later on January 10, 1980. At the time of her discharge, the patient was almost totally blind. Her speech and hearing were significantly impaired. She could not move or stand without assistance. The neurologist diagnosed her condition as permanent.

Plaintiffs and defendants each presented a board certified anesthesiologist from another city to support their respective positions. Plaintiffs' expert attributed the patient's brain damage to blockage, dislodgment or malpositioning of the endotracheal tube. According to plaintiffs' expert, the anesthesia assistant failed to monitor the patient's breathing properly, so the patient lacked oxygen for ten to fifteen minutes. He said that an increased pulse rate is an early symptom of oxygen starvation. He concluded that the assistant failed to detect and report the breathing problem promptly.

Defendants' expert testified that the thirty degree Trendelenburg position and the intra-abdominal pressure from the carbon dioxide caused the patient's lack of oxygen. This witness did not trace the patient's injuries to the assis-

tant's acts or omissions. Rather, he said the anesthesiologist should have requested the gynecologist to level the operating table and remove the abdominal carbon dioxide when the problem developed. He concluded that the patient's breathing difficulties began when the gynecologist put the patient into the thirty degree Trendelenburg position and inflated her abdomen.

## II

Defendants' first and second assigned errors challenge the trial court's order granting plaintiffs' motion for a new trial:

"I. The trial court erred in granting plaintiffs' motion for a new trial on the ground that it committed prejudicial, reversible error in its procedure excluding proceedings and orders of the State Medical Board of Ohio.

"II. The trial court abused its discretion in granting a new trial on the ground that the verdict of the jury is contrary to and against the manifest weight of the evidence."

## A

The trial court's first ground for the new trial order was a supposed error at trial in excluding relevant evidence. Prior to trial, defendants filed a motion *in limine* to prevent plaintiffs from offering evidence about minutes of a State Medical Board meeting. Apparently, the board expressed a view that some unspecified activities by "anesthesiology assistants" constitute the practice of medicine by unlicensed persons.

The originally assigned judge journalized an order in which he reserved ruling on the defense motion until the time of trial. The case was reassigned for trial. Nothing in the trial record indicates that counsel requested or the judge ever made any ruling on the motion or the admissibility of such evidence. In its new trial order, the court states that it advised counsel before trial "to refrain from doing those things that were the subject of the motion."

A trial court may grant a new trial when it finds that it committed an error of law during the trial. Civ. R. 59(A)(9). However,. the trial court does not exercise discretion in making such a ruling. Consequently, the appellate court will reverse the new trial order when the challenged action was not error or was not prejudicial. *Rohde* v. *Farmer* (1970), 23 Ohio St. 2d 82 [52 O.O.2d 376], paragraph two of the syllabus.

In *State* v. *White* (1982), 6 Ohio App. 3d 1, this court explained the significance of pretrial rulings on motions *in limine* at 4:

"* * * An order *in limine* is a tentative or presumptive evidence ruling which states the court's *anticipated* treatment of an evidentiary issue if special circumstances do not cause a different treatment when the issue actually arises. * * * [Citations omitted.] It cannot be a definitive ruling on an evidence issue until the full context and foundation for the issue has been developed. * * *

"* * *

"Therefore, in order to preserve supposed error from an anticipatory order *in limine,* the complaining party must raise the evidentiary issue on the record at the place in the trial that the foundation and context has actually been developed. Such an anticipatory order is a salutary procedure, because it guides counsel's expectancies in potentially complicated areas and it prevents the controversy from reaching the jurors. Thus, any proffer of the presumptively proscribed evidence must be done outside the jury's hearing, unless and until the trial court concludes that the evidence is not properly admissible.

"If counsel seeks to develop the proscribed material during direct examination or through an exhibit, that counsel must make an 'offer of proof' outside the jury's hearing, when the evidence

issue is actually ripe for dispositive action, or he may well have waived his objection to the order *in limine.* Evid. R. 103(A)(2). * * *'' See, also, *State* v. *Spahr* (1976), 47 Ohio App. 2d 221, 226 [1 O.O.3d 289]; *Hammon* v. *Moon* (1982), 8 Ohio App. 3d 66, 70.

The record clearly shows that the plaintiffs never offered the disputed evidence during the trial. Thus, the court never excluded it. The trial court incorrectly premised its new trial order on an error of law that it did not commit.

Additionally, the contested exhibit would have been inadmissible if it had been offered. The exhibit does not disclose which specific activities the board considered to be the practice of medicine. The record fails to show whether this anesthesia assistant performed such activities during this patient's surgery. Without that foundation, the disputed exhibit is irrelevant. Further, the board's conclusions are hearsay opinions which do not satisfy the Ohio public records exception to the hearsay rule. Evid. R. 803(8); cf. Fed. Evid. R. 803(8)(C) (no counterpart in Ohio rules).

Finally, the exclusion of such evidence was necessarily harmless even if it had been error. If it had any probative value, it related solely to plaintiffs' contention that the anesthesia assistant engaged in the unauthorized practice of medicine. The resolution of that issue should probably have been a fact issue on the trial evidence. However, the court instructed the jury as a matter of law that her conduct was the practice of medicine. Since we must presume that the jury followed the court's instructions, the contested exhibit could not have changed the resulting verdict. Cf. *Parker* v. *Randolph* (1979), 442 U.S. 62, 73.

## B

The trial court's second ground for the new trial order was its discretionary determination that the verdict was contrary to the weight of the evidence. Civ. R. 59(A)(6). Because that ruling involves judicial discretion, our standard for reviewing it differs from our review of the first stated ground. We must affirm a new trial order premised on a discretionary decision unless the complaining party demonstrates that the court thereby abused its discretion. *Jenkins* v. *Krieger* (1981), 67 Ohio St. 2d 314, 320 [21 O.O.3d 198]; *Rohde* v. *Farmer, supra,* paragraph one of the syllabus.

When a trial court's decision on a new trial motion involves questions of fact, "a reviewing court should view the evidence favorably to the trial court's action rather than to the jury's verdict." *Jenkins, supra,* at 320. The exercise of that discretion may require an evaluation of witness credibility which is not apparent from the transcript. It measures the surrounding circumstances and the trial atmosphere to decide whether the jury's verdict resulted in manifest injustice. *Id.*

In effect, the trial judge oversees the jury's fact finding function with greater authority than an appellate court to upset the jury's factual findings. Like an appellate court, the trial court cannot grant a new trial on the weight of evidence more than once. Civ. R. 59(A)(6); App. R. 12(C). If the trial court's discretionary action in granting a new trial is supported by competent, credible evidence, a reviewing court will not reverse. Cf. *C.E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261].

Viewing the evidence here in a light most favorable to the trial court's action, we find no abuse of discretion. If believed, plaintiffs' evidence established (a) the patient suffered severe brain damage from oxygen starvation during her surgery, (b) the lack of oxygen persisted over a ten to fifteen minute period between 8:20 and 8:45 a.m., (c) a problem with the administration of her anes-

thesia caused the lack of oxygen, (d) the anesthesia assistant was responsible for monitoring the patient's response to her anesthesia during that time, (e) the assistant failed to make chart notations to show she was properly monitoring the patient's vital signs, (f) the dental resident first noticed resistance in the patient's ventilating bag, (g) the resident noticed ventilating bag resistance at 8:36 or 8:37, but the assistant did not notify the anesthesiologist until 8:45, (h) the patient's ventilation difficulty resulted from a blockage or displacement of her endotracheal tube, and (i) the assistant either failed to detect and report, or was inadequately trained to detect, early symptoms of tube blockage or displacement.

The trial court erred by granting plaintiffs a new trial because of its supposed error of law. To this extent, defendants' first assigned error has merit, but it does not justify reversal. The court did not act arbitrarily, capriciously or unreasonably by granting a new trial based on its perception of the weight of the evidence. Defendants' second assigned error is overruled, and the first assigned error is harmless.

### III

Defendants' third, fourth, and fifth assignments assert errors which are moot after the jury's verdict and the later new trial order:

"III. The trial court erred when it instructed the jury that Mt. Sinai and the anesthesiologist's assistant were engaged in the unauthorized practice of medicine.

"IV. The trial court erred in holding that plaintiffs-appellees may pursue a strict liability claim for damages against Mt. Sinai on the theory of absolute nuisance.

"V. Mt. Sinai is not liable as a matter of law for an alleged failure to obtain informed consent."

In all three of these assigned errors, defendants request this court to prevent the trial court from making various alleged errors on retrial. They argue that they will be prejudiced if the trial court again instructs the jury that the anesthesia assistant was engaged in the unauthorized practice of medicine. They complain that the trial court should not allow plaintiffs to rely on two liability theories which they did not assert in the first trial. None of these assigned errors presents this court with an alternative ground for affirming or reversing the trial court's order granting plaintiffs a new trial.

These assigned errors depend for their resolution on the pleadings, evidence, and objections adduced at trial. We do not even know whether the same trial judge will decide these matters in the retrial. We cannot determine whether the pleadings and evidence at the new trial might support the allegedly erroneous instructions. Similarly, we are unable to determine whether the court would abuse its discretion by allowing pleading amendments without knowing the circumstances when plaintiffs might request them. Nor can we anticipate the propriety of claims based on nuisance or failure to obtain an informed consent in a future trial. We cannot prospectively postulate about the pleadings, the evidence, or the objections that may be considered then.

Our decisions are not rendered in a vacuum; they are necessarily tied to specific *past* facts or orders. The proscription against advisory opinions prevents us from dealing with the substance of these assigned errors. *Fortner* v. *Thomas* (1970), 22 Ohio St. 2d 13 [51 O.O.2d 35]. For that reason, we overrule defendants' third, fourth, and fifth assignments of error.

### IV

Defendants' sixth assignment of error contends that the trial court should not have submitted the case to the jury:

"VI. The trial court erred in refusing to hold that Jane Allinson, an anes-

thesiologist's assistant, was the borrowed servant of Dr. Kleinman, a physician-anesthesiologist, and the Cleveland Anesthesia Group, Inc."

Defendants claim the trial court erroneously denied their motions for summary judgment and for a directed verdict because the anesthesia assistant was a loaned servant. This contention has no possible merit for the defendant anesthesia assistant, since she is liable for her own conduct regardless of who employed her. For the reasons previously expressed, we cannot speculate whether the hospital should be liable for her acts at a retrial with different evidence. However, we do consider whether the hospital should have obtained judgment as a matter of law on that basis, as an alternative ground for reversal.

In *Halkias* v. *Wilkoff Co.* (1943), 141 Ohio St. 139 [25 O.O. 257], the Supreme Court explained the loaned servant doctrine at 151-153:

" '* * * [W]hen one person lends his servant to another for a particular employment, the servant for anything done in that particular employment must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him.' * * *

" '* * * An employer is not liable for injury negligently caused by a servant if the latter is not at the time in the service of the employer, but in the special service of another, although the question of liability is ultimately dependent upon the determination of who has the power to control and direct at the exact time of the act in question. In other words, in determining whether, in respect of a particular act, a servant, in the general employment of one person, who has been loaned for the time being to another is the servant of the original employer or the person to whom he has been loaned, the test is whether in the particular service which he is engaged to

perform, the servant continues liable to the direction and control of his general employer or becomes subject to that of the person to whom he is lent, — whether the latter is in control as proprietor so that he can at any time stop or continue the work and determine the way in which it is to be done, with reference not only to the result reached but to the method of reaching it.' * * *

"Since the question of liability is always predicated upon some specific act of the servant, it is not important whether he remains the servant of the general employer as to matters generally, but whether, in performing the act in question, he is acting in the business of and under the direction of the general employer or that of the temporary employer. The mere fact that the general employer continues to pay the wages of the servant who has committed the wrong will not make such employer liable for the wrongful act where it appears that the person, to whom the servant is lent, controlled him entirely as to the work done." See, also, *Baird* v. *Sickler* (1982), 69 Ohio St. 2d 652, 655 [23 O.O.3d 532].

Civ. R. 50(A)(4) precludes a directed verdict unless:

"* * * the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *."

Construing the evidence in this trial most strongly in plaintiffs' favor, the trial court properly submitted the loaned servant issue to the jury.

There was evidence that (a) the hospital was responsible for hiring and firing the anesthesia assistant, (b) the hospital paid her wages, fringe benefits, and liability insurance, (c) the hospital established guidelines for her duties and responsibilities in the operating room,

(d) she instructed the hospital's dental residents and student anesthesia assistants as part of her hospital duties, (e) during this patient's surgery, she was instructing one of the hospital's dental residents, and (f) neither the anesthesiologist nor his group reimbursed the hospital for her services.

In many respects, her services resemble the duties of a hospital nurse who accomplishes hospital responsibilities but reports problems to an attending physician. This evidence would permit a finding that she was not under the anesthesiologist's sole direction, control, or service, at the time of her alleged negligence. Thus, the trial court did not err by denying a directed verdict and submitting this issue to the jury. Cf. *Baird* v. *Sickler, supra.*

In addition, there was some evidence that the hospital supplied her to assist the anesthesiologist when she was inadequately qualified for those duties. If her expected duties involved medical judgments, she was not trained or licensed to perform such acts. If so, the hospital was liable for its own negligence in loaning an unqualified servant. See Restatement of the Law 2d, Agency (1958), Section 213, Comment *d; Becken* v. *Manpower, Inc.* (C.A.7, 1976), 532 F. 2d 56, 58; *Colwell* v. *Oatman* (1973), 32 Colo. App. 171, 510 P. 2d 464.

We need not evaluate the evidentiary materials supporting and opposing the hospital's summary judgment motion on this issue. Any error in denying that motion is moot or harmless, even if it had merit when the court denied it. *Graham* v. *Pavarini* (1983), 9 Ohio App. 3d 89, 95. The subsequent trial demonstrated that there was a genuine issue of material fact on this subject. Defendants' final assigned error is overruled.

## V

Plaintiffs' sole assignment of error concerns the patient's daughter's claim: "The trial court erred in granting defendants' motion for reconsideration and dismissing count three of plaintiffs' second amended complaint — the minor daughter's claim for loss of parental consortium."

The daughter urges this court to find her claim legally cognizable under Ohio law. Plaintiffs admit that no Ohio appellate court has recognized such a claim. In *Gibson* v. *Johnston* (App. 1956), 75 Ohio Law Abs. 413, the Second District Court of Appeals rejected a similar claim at 416:

" 'In Ohio, an infant, acting through a next friend, cannot maintain an action against third persons for damages for loss of the love, affection, society, guidance, or companionship of his or her * * * [parent], even though the acts of such third persons which caused such loss were willful and malicious.' "

The Supreme Court made a related ruling in *Kane* v. *Quigley* (1964), 1 Ohio St. 2d 1 [30 O.O.2d 1], syllabus:

"A petition by a minor child, alleging that a defendant wrongfully induced the plaintiff's father to abandon his family thereby (1) depriving the plaintiff of his father's affection, companionship and guidance and (2) bringing unwanted attention and unwarranted publicity causing embarrassment, humiliation and loss of social standing to the plaintiff, is subject to demurrer on the ground that it fails to state a cause of action."

In the *Kane* case, the court reasoned at 2:

"There is no statutory basis for such a cause of action in Ohio.

"Such an action is not known at common law."

We are mindful that more recent Ohio decisions afford rights to previously unrecognized tort claimants, consistent with analysis used by Justice Gibson's dissent in *Kane.* Plaintiffs argue that recent federal and state supreme court decisions also manifest an intention to expand children's legal rights.

They contend that expansion should encompass the right to recover for loss of parental consortium. As authority for that proposition, they cite decisions from other states and an unreported common pleas court decision from another county.

Thus far, the great majority of decisions on this issue from other jurisdictions have rejected plaintiffs' contention. See Annotation (1982), 11 A.L.R. 4th 549 (and Later Case Service) (citing three jurisdictions in plaintiffs' favor and nineteen contrary jurisdictions). Some "progressive" courts reject plaintiffs' present contention while allowing recovery for the child's comparable loss in an action for the parent's wrongful death. *E.g., Borer* v. *American Airlines, Inc.* (1977), 19 Cal. 3d 441, 563 P. 2d 858; *Russell* v. *Salem Transp. Co.* (1972), 61 N.J. 502, 295 A. 2d 862.

This court recently recognized a mother's action for the loss of her child's services and society. *Norvell* v. *Cuyahoga County Hospital* (1983), 11 Ohio App. 3d 70. However, the *Norvell* case relied heavily on provisions for that action and comparable spousal claims for loss of services in Civ. R. 19.1. Both the Supreme Court and the legislature had occasion to consider and act upon the Civil Rules. Consequently, this court could infer their approval for such actions. In *Norvell,* we also found legislative support for our decision in statutes governing family relations. Regrettably, neither the Civil Rules nor any other action by the Supreme Court or the legislature provides any guidance here.

Intermediate appellate courts should follow prior Supreme Court rulings unless they have good reason to know those rulings no longer apply. Cf. *Krause* v. *State* (1972), 31 Ohio St. 2d 132 [60 O.O.2d 100], at 148-149 (Corrigan, J., concurring). They should defer to more central policy making instrumentalities whenever feasible. The legislature is the foremost policy maker. When the legislature provides no answer, the highest court may choose to set the course.

We decline to establish a new cause of action at this time. In so ruling, we recognize that this case has not yet reached its conclusion. If this issue reappears after the retrial, we can determine whether the legislature or the Supreme Court has shed any further light in the interim. At least for now, we overrule plaintiffs' assigned error.

The trial court's order for a new trial is affirmed, and the cause is remanded for further proceedings.

*Judgment affirmed*
*and cause remanded.*

PRYATEL, J., concurs.

NAHRA, J., dissents.

NAHRA, J. I respectfully dissent because I believe the trial court abused its discretion in finding the jury verdict was against the manifest weight of the evidence.

We are concerned here only with negligence, if any, of the anesthesiologist's assistant since the anesthesiologist himself settled with the plaintiff before trial for 1.1 million dollars.

The Supreme Court of Ohio has ruled that when a trial judge overturns a jury verdict because it is not sustained by the weight of the evidence, the trial court must articulate its reasons for doing so in order to facilitate appellate review. *Antal* v. *Olde Worlde Products, Inc.* (1984), 9 Ohio St. 3d 144. The trial court's reasons cannot be couched in the form of conclusions or statements of ultimate fact or they will be deemed insufficient. *Id.* at 147. This case was sent back to the trial court to make the required findings. Although the trial court's entry contains introductory matter and background facts, the justifica-

tion for granting a new trial is set forth as follows:

"It was negligence for the employee of the hospital to fail to timely detect the malfunctioning of the oxidation [*sic*] of the plaintiff. By the time the dislodging of the endotracheal tube was discovered — a period in excess of five minutes — the injury had occurred."

Appellants contend that the trial court's statement is conclusory and set forth in terms of established facts and provides no analysis or insight as to why the jury verdict was not supported by the weight of the evidence. I agree since the trial court merely concludes that Ms. Allinson failed to timely detect the lack of oxygenation of plaintiff without setting forth the evidence in support of that conclusion. Without the trial court's analysis, we can only speculate as to what the trial court found to be credible and in support of its ruling. If mere conclusions by the trial court are sufficient to set aside a verdict, appellate review of the trial court's exercise of discretion would be rendered meaningless.

In this case, even if the trial court's statement is deemed to be sufficient, it was unreasonable for the trial court to reverse the jury verdict. The evidence was conflicting as to whether plaintiff's injuries were caused by the malfunctioning of the oxygenation, but there was no evidence that the anesthesiologist's assistant failed to timely detect the problem. In fact, the evidence is to the contrary. The record clearly establishes that the plaintiff's vital signs were still within normal limits *after* the anesthesiologist was notified of the problem and was himself seeking to correct it. Experts from both sides agreed that if the problem was detected while the vital signs were within normal limits, it would have been a timely detection.

It seems the jury's finding of no negligence by the anesthesiologist's assistant was clearly supported by the weight of the evidence rather than the

other way around. Therefore, it was an abuse of discretion for the trial court to set aside the jury verdict.