OPINION
The plaintiff/appellant, New Haven Corner Carryout Incorporated ("New Haven" or "the appellant"), appeals several judgments of the Seneca County Court of Common Pleas, all of which were adverse to the appellant. Based on the following, we affirm the judgment of the trial court.
This case arises out of a contract dispute between the appellant, a service station, and its fuel distributor, Clay Distributing Company ("Clay" or "the appellee"). On February 1, 1990, the parties entered into a Distribution Agreement ("the agreement"), whereby Clay was to deliver gasoline and diesel fuel to New Haven for sale at the service station. Pursuant to the agreement, the appellant is required to remit a check each day to Clay for the actual daily fuel sales registered on its pumps. Within twenty days of the end of each month, Clay must pay to New Haven one-half of the gross profit derived from the sale of diesel fuel and gasoline.
George R. Paul was president of Clay from 1987 until September 1995. Just prior to 1987, Mr. Paul was the sole shareholder in Clay; however, he sold all but one of his shares to William F. Beck before becoming president. In 1990, the year the station opened, Mr. Paul acquired a fifty percent shareholder interest in New Haven, acting as a silent partner. Thus, Mr. Paul was the president of Clay and a major stockholder in New Haven at the time that the parties entered into the agreement. In fact, his signature appears on the document in his capacity as president of Clay.
Mr. Paul became president of New Haven in 1996, after his resignation from Clay. He claimed that, upon examining the station's books, he found several irregularities, including a problem with Clay's computation of "gross profit." Ultimately, New Haven filed suit against Clay seeking to invalidate the agreement. New Haven's complaint alleged material breach and impossibility of performance. Clay counterclaimed for failure to pay money owed under the contract.
Clay moved for summary judgment on New Haven's claim of impossibility. New Haven also moved for summary judgment. On March 29, 2001, Clay's motion was granted and New Haven's was denied. The case then proceeded to jury trial on April 18, 2001 on the claim for material breach of contract and the cross-claim. At the trial's conclusion, the case was removed from the jury for determination of all issues by the court. On June 25, 2001, the court found for Clay on all issues.
The appellant filed a Motion for New Trial on July 3, 2001, which was denied by a September 26, 2001 judgment entry. The appellant now brings this appeal, asserting three assignments of error for our review.
 ASSIGNMENT OF ERROR NO. I The trial court committed reversible error when it overruled Plaintiff's Motion for Summary Judgment and granted Defendant's Motion for Summary Judgment as to count one of Plaintiff's complaint.
The appellant claims that the trial court erred when it simultaneously granted the appellee's motion for summary judgment and denied the appellant's motion as to the appellant's claim of impossibility of performance. Based on the following, we disagree with the appellant.
Standard of Review for Summary Judgment
In considering an appeal from the granting of a summary judgment, our review is de novo, giving no deference to the trial court's determination.[1] Accordingly, we apply the same standard for summary judgment as did the lower court.[2]
Summary judgment is proper when, looking at the evidence as a whole (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds could only conclude in favor of the moving party.[3] The initial burden in a summary judgment motion lies with the movant to inform the trial court of the basis for the motion and identify those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.[4] Those portions of the record include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action.[5]
Once the movant has satisfied this initial burden, the burden shifts to the nonmovant to set forth specific facts, in the manner prescribed by Civ.R. 56(C), indicating that a genuine issue of material fact exists for trial.[6] The nonmoving party may not merely rely on the pleadings nor rest on allegations, but must set forth specific facts that indicate the existence of a triable issue.[7]
 Impossibility of Performance
This particular aspect of the dispute centers around the mechanism by which gross profit is determined under the agreement. In the agreement, "gross profit" is defined as the difference between the retail price and the "delivered cost" of the fuel. Also provided are definitions of "delivered cost" for both gasoline and diesel fuel. The agreement reads, in relevant part,
 "The delivered cost of gasoline shall be Marathon Petroleum Company's Toledo rack price plus $.025 per gallon for a period of two years. The rate of $.025 per gallon will be adjusted every two years to reflect a proportionate increase or decrease in the published Common Carrier Rate of Refiner's Transport of Toledo, Ohio.
 "The delivered cost of diesel fuel shall be Marathon Petroleum Company's Bellevue rack price plus $.015 per gallon for a period of two years. The rate of $.015 per gallon will be adjusted every two years to reflect a proportionate increase or decrease in the published Common Carrier Rate of Refiner's Transport of Toledo, Ohio."
Around 1994, the United States Environmental Protection Agency ("EPA") enacted regulations that classified diesel fuel into two categories based on sulfur content. The EPA regulations mandated that only low sulfur diesel fuel could be used in over-the-road vehicles, the only type of vehicles to which New Haven sells diesel fuel. Subsequent to the enactment of these regulations, in October 1994, Marathon's Bellevue facility stopped selling diesel fuel for over-the-road vehicles. Consequently, it no longer posted a price for this type of fuel. Unable to abide by the agreement's original terms, Clay began to purchase diesel fuel from Marathon's Toledo terminal, using its price for the purpose of calculating profits.
Some time during the initial term of the agreement, Refiner's Transport of Toledo, Ohio went out of business. Therefore, it stopped publishing a Common Carrier Rate. This left the parties without the ability to make the agreed-upon adjustment according to the original terms of the contract. The appellee began using the actual freight rate that it incurred in order to determine "delivered cost" under the agreement.
Impossibility of performance arises where, after parties enter into a contract, an unforeseen event renders impossible the performance of contractual duties of one or both of the parties.[8] Absent contrary contractual terms, either party can often avoid an agreement when governmental activity renders its performance impossible or illegal.[9]
The appellant argues that the formula for determining gross profit was a material element of the agreement. Therefore, performance under the agreement became legally impossible after the passage of the EPA regulation and further when the Refiner's Transport stopped publishing a Common Carrier Rate because the agreed-upon definition of delivery cost for diesel and gasoline no longer existed. Because the federal law and the abolition of the published Common Carrier Rates were events that could not have been foreseen by the parties, the appellant urges that it be excused from performance under the agreement.
The parties are in accord that the original pricing mechanisms contained in the contract have failed. However, the appellee contends that this failure does not render the agreement impossible to perform. Rather, argues the appellee, a "reasonable price" should be imposed on the parties in order to permit completion of the contract. The appellee cites Oglebay Norton Co. v. Armco, Inc.[10] In Oglebay, the operator of a steel shipping company brought an action against a long-time customer for enforcement of a contract whereby the plaintiff provided services to the defendant for shipment of steel. Both the primary and secondary pricing mechanisms in the contract had failed. Nevertheless, after a lengthy bench trial, the trial court found that the parties intended to be bound even upon such a failure and imposed what it determined to be a "reasonable price."
We agree with the appellee that Oglebay may permit the trial court to impose a "resonable price" on the parties here so that the agreement could be fulfilled. However, Oglebay makes clear that such a disposition is only appropriate where the parties have evidenced an intent to be bound despite the failure of pricing terms.[11] "Whether parties intend to be bound, even upon failure of the pricing mechanisms [in a contract], is a question of fact properly resolved by the trier of fact."[12]
The appellee has presented evidence that the parties did intend to be bound even though the pricing terms failed. Specifically, the appellee notes that, as in Oglebay, the parties operated under the agreement on a daily basis for many years. More significantly, the parties continued to operate under the agreement even after the pricing indices became unavailable.
The appellant, on the other hand, contends that when the pricing mechanisms failed, New Haven began to question the appellee about how it was calculating gross profit, but received no satisfactory explanation. Finally, in 1999, it commenced legal action to resolve the issue. However, the evidence presented by New Haven in support of this claim reveals that these inquiries commenced only after Mr. Paul became president of New Haven in 1996. As the appellant points out, the pricing term for diesel fuel failed in October of 1994 and the freight rate for gasoline was no longer published as of 1995. This makes it clear that the parties operated under the agreement for a number of months without the benefit of the original pricing terms and without objection. Thus, the appellant fails to direct us to any evidence that, if believed, supports its claim that it did not intend to be bound upon failure of the original terms. Therefore, reasonable minds could only conclude that the appellee was entitled to summary judgment.
Accordingly, the appellant's first assignment of error is not well-taken and is hereby denied.
 ASSIGNMENT OF ERROR NO. II The trial court committed reversible error when it found in favor of the defendant and against the plaintiff at trial.
The appellant argues in this second assignment of error that the trial court's judgment in favor of the appellee was against the manifest weight of the evidence. We disagree with the appellant.
The appellant takes issue with the fact that the trial court adopted "almost verbatim" the Proposed Findings of Fact and Conclusions of Law submitted by the appellee at the conclusion of trial. As the appellee points out, a trial court may properly adopt as its own a party's proposed findings of law, so long as it has thoroughly read the document to ensure that it is completely accurate in fact and law.[13] Therefore, the trial court's adoption of the appellee's findings of fact and conclusions of law is not in error unless the appellant can show that the facts or law taken up were erroneous. Although the appellant has made no specific argument to that effect, we will address the accuracy of the court's findings in our review for manifest weight of the evidence.
It is axiomatic that, in the case of a civil trial, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as against the manifest weight of the evidence.[14] Furthermore, the well-settled proposition that evaluating evidence and assessing credibility are primarily for the trier of fact[15] is equally true in a bench trial because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."[16]
Therefore, absent extreme circumstances, an appellate court will not second guess determinations of weight and credibility.
The issue before the trial court was whether either of the parties materially breached the agreement. New Haven claimed that Clay's alleged breaches entitled New Haven to terminate the agreement and to receive monetary damages. Clay, on the other hand, sought enforcement of the contract and money damages. We note at the outset that the appellant takes issue with nearly all of the trial court's 176 findings of fact and conclusions of law, which appear in the June 25, 2001 judgment entry. We will address only those findings and conclusions that pertain to the essential elements of the case.
A number of the issues raised by the appellant address what this Court would describe as the semantics of the trial court's judgment entry. The appellant objects to the fact that, in several places in its entry, it uses terms that are not found in the record to characterize certain evidence. The appellant fails to show how it was in any way prejudiced by this practice. Absent a showing of prejudice, we will not require the trial to use the exact language from the transcript in formulating its judgment entry.
New Haven argues that the trial court should not have applied the doctrine of waiver in this case to preclude it from asserting certain arguments regarding several provisions of the agreement in support its claim for breach of contract. Specifically, the trial court found that waiver applied to preclude the appellant's claim with respect to the price of diesel fuel, freight rates, and its entitlement to share with Clay the shrinkage allowance, credit card fee, and the advertising fee.
Waiver is defined as a voluntary relinquishment of a known right.[17]
Waiver need not be established through express statement in a contract; it may also be inferred through the acts and conduct of the parties.[18]
However, the party relying on implied waiver has the burden of showing by a preponderance of the evidence that a waiver, through clear and unequivocal acts or conduct, did occur.[19]
At trial, the appellant's primary witness, Mr. Paul, admitted on cross-examination that at the time when the calculations for gross profit were altered with respect to diesel fuel and freight rates, neither he nor anyone else at New Haven complained. In fact, no objection was lodged until after Mr. Paul stepped down as Clay's president and became involved with New Haven exclusively.
Similar testimony was provided with regards to the issues of shrinkage allowance, credit card fee, and the advertising fee. According to Mr. Paul, the parties have been dealing with each of these items in a particular way for a number of years. Again, the appellant objected to the practices only after Mr. Paul left Clay and became president of New Haven. Ironically, Mr. Paul also admitted that, while at Clay, he at least knew of all and possibly implemented some of the various practices about which New Haven now complains. Based on Mr. Paul's testimony alone, we conclude that, by the manifest weight of the evidence, the appellee showed that a waiver, through clear and unequivocal acts or conduct, did occur.
The appellant also contends that it showed by the manifest weight of the evidence that the appellee was improperly determining "gross profit." However, because we agree with the trial court's finding that the appellant waived its right to object to the appellee's calculation of "gross profit," the propriety the formula used is irrelevant. Therefore, we need not address this argument.
The appellant claims that the manifest weight of the evidence shows that Clay illegally mixed gasoline of different octane ratings and that it illegally mixed diesel fuel with gasoline, thus materially breaching the agreement. We note at the outset that, regardless of the legality of these acts, there is nothing in the agreement that expressly prohibits Clay from either mixing gasoline of different octane ratings or mixing diesel fuel with gasoline. Therefore, it was not against the manifest weight of the evidence to find that neither of these acts amount to breach of contract. Moreover, the manifest weight of the evidence does not show that Clay violated any laws.
There was evidence presented at trial that the some of the appellee's drivers mixed a lower octane with a higher octane fuel. In fact, Mr. Douglas Beck, President of Clay, testified that, while it was not company policy, on at least one occasion someone at Clay instructed a driver to perform this type of mixing.
Mr. John Grant, a regional manager for Marathon testified briefly that combining one octane with another is illegal. There was no testimony regarding what actual law prohibited this mixing. Moreover, other testimony showed that mixing is not necessarily illegal as long as the fuel in each of the tanks meets the minimum octane rating required by law. Mr. Paul's testimony revealed that the octane rating on each of the tanks indeed reflects a minimum octane rating. The appellant could not establish the actual octane rating of the tanks before the lower octane was added to the tank. Therefore, it could not to establish that the mixing of octane levels caused the rating in the tanks to fall below the legal minimum.
With regards to the mixing of diesel fuel with gasoline, no testimony established that this practice was, in fact, illegal. Although the evidence revealed that damage was caused on one occasion when this happened, it also showed that the appellee paid these damages.
The appellant fails to show how the rest of the alleged errors it cites in support of this assignment of error affect the ultimate outcome of the case. In order for a reviewing court to justify a reversal, the record must reflect that the errors asserted prejudiced the party seeking the reversal.[20] As the appellee points out, Ohio has expressly rejected the theory that cumulative minor errors warrant reversal.[21] Thus, even if we determined that some of the trial court's findings were erroneous, we could not reverse based on quantity of errors alone. Rather, there must be a showing of prejudice for each individual error. Because we find that the appellant was not prejudiced by any of the court's findings, we decline to address the remaining arguments individually.
Accordingly, the appellant's second assignment of error is not well-taken and is hereby overruled.
 ASSIGNMENT OF ERROR NO. III The trial court committed reversible error when it overruled Plaintiff's motion for a new trial.
For its final assignment of error, the appellant presents several arguments regarding why the trial court should have granted its motion for a new trial. We will address each of these arguments in turn. Certain of the appellant's arguments regarding its motion for a new trial essentially contend that the trial court erred as a matter of law, while others raise questions about the court's weighing of evidence. Because these two types of arguments require different standards of review, we will divide them accordingly.
 Asserted Errors of Law
When a new trial is requested on the basis that an error of law was committed, a reviewing court does not make a determination of whether or not the trial court abused its discretion, as the trial court is not exercising discretion when reviewing a motion for a new trial on this basis.[22] Thus, a reviewing court will not reverse the decision of the trial court overruling a motion for new trial when the challenged action was not error or was not prejudicial.[23]
The appellant first argues that it was essentially coerced into withdrawing its jury demand and submitting the case to the trial court for determination. Civ.R. 38, which governs the right to trial by jury, reads in relevant part:
"(B) Demand.
 "Any party may demand a trial by jury on any issue triable of right by a jury by serving upon the other parties a demand therefor at any time time after the commencement of the action and not later than fourteen days after the service of the last pleading directed to such issue. Such demand shall be in writing and may be indorsed upon a pleading of the party. * * * *
"(C) Specification of issues.
 "In his demand a party may specify the issues which he wishes so tried; otherwise he shall be deemed to have demanded trial by jury for all the issues so triable. If he has demanded trial by jury for only some of the issues, any other party within fourteen days after service of the demand or such lesser time as the court may order, may serve a demand for trial by jury of any other or all of the issues of fact in the action."
Civ.R. 39, also relevant to this case, states as follows:
"(A) By jury
 "When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist. The failure of a party or his attorney of record either to answer or appear for trial constitutes a waiver of trial by jury by such party and authorizes submission of all issues to the court."
The parties agreed throughout the proceedings in this case that a number of questions of law needed to be decided by the court before the case was submitted to a jury. At the conclusion of the trial, the court stated that it would take approximately one week to resolve these issues, due in part to the case's complexity and in part to the trial court's other commitments. This meant that the jury would be recalled after only after the court ruled on the various issues. Upon this revelation, both parties agreed on the record to remove the case from the jury for resolution of all issues by the trial court. The appellant contends that it effectively had no choice but to withdraw its jury demand and that it only did so to avoid wasting time, money, and resources.
The appellant did not raise this objection at trial, notwithstanding the fact that its counsel clearly had notice and opportunity to object at the time the issue was raised. "Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed."[24] Unless we find plain error, we must uphold the jury waiver. Plain errors constitute any "errors or defects affecting substantial rights [and] may be noticed although they were not brought to the attention of the court."[25] To determine whether the trial court committed plain error, the reviewing court must determine whether, "but for the error, the outcome of the trial clearly would have been otherwise."[26] Although the plain error doctrine is primarily applied in criminal cases, its application to civil cases may be necessary in "`extremely rare situations * * * to prevent a manifest miscarriage of justice * * *.'"[27] Upon review of the record, we find that no manifest injustice occurred as a result of the decision to submit the entire case to the trial court.
The appellant claims that it was deprived of due process because the trial court failed to answer each and every one of the appellant's jury interrogatories. According to the appellant, it withdrew its jury demand upon the express condition that the trial court would answer the interrogatories.
At the conclusion of the trial, the following conversation took pace between the court and the appellant's attorney, Mr. Barga:
 "THE COURT: * * * * Mr. Barga had a list of questions and interrogatories. I had indicated that I would answer those * * * *. So, that we're clear, I did not agree to answer each and every one the, of those questions specifically * * * *. Is that a correct recitation of what was discussed in my office? (EMPHASIS ADDED)
"MR. BARGA: Yes, I believe it is. * * * "
Thus, the appellant not only failed to object to the trial court's decision not to address each of its interrogatories, its attorney affirmatively agreed to this decision on the record. The only condition to dismissing the jury that the appellant made on the record was that it be permitted to revise its exhibit 25, which contained its calculation of the monetary damages suffered by New Haven.
The Ohio Rules of Civil Procedure do not require a court to answer jury interrogatories after a bench trial. In fact, pursuant to Civ.R. 52, a trial court may enter a verdict without issuing any supporting findings of fact and conclusions of law, unless requested to do so in writing by a party. Thus, there is no legal reason why the trial court should be made to answer the appellant's interrogatories. Accordingly, the appellant's contention that it is entitled to a new trial due to this issue is without merit.
The appellant next asserts that it is entitled to a new trial because the trial court entered two contradictory judgment amounts in its original judgment entry. Specifically, on page two of the entry, the court granted judgment for Clay against New Haven in the amount of $280,050.42. However, on page thirty-four of the same entry, the trial court finds damages for Clay in the amount of $293,769.35. Later, in its Journal Entry on Plaintiff's Motion for New Trial, the trial court corrects itself, agreeing with the appellant that the amount of the judgment on page thirty-four of the judgment entry was incorrect and should have read $280,050.42. Accordingly, we fail to see how the appellant was prejudiced by the trial court's initial error. The appellant is not entitled to a new trial based on this issue.
The appellant argues that the trial court's a adoption of the appellee's Proposed Findings of Fact and Conclusions of Law violated Civ.R. 52, which states:
 "When questions of fact are tried by the court without a jury, judgment may be general * * * unless one of the parties in writing requests otherwise * * * in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law."
The purpose of Civ.R. 52 is "`to aid the appellate court in reviewing the record and determining the validity of the basis of the trial court's judgment.'"[28] In light of its purpose, while there is no precise rule regarding compliance with Civ.R. 52, the findings and conclusions must articulate an adequate basis upon which a party can mount a challenge to, and the appellate court can make a determination as to the propriety of, resolved disputed issues of fact and the trial court's application of the law.[29]
The trial court's judgment entry which contained it findings of fact and conclusions of law was 34 pages long and contained 176 paragraphs, each of which constituted a separate finding. Regardless of whether these findings were partially adopted from the appellee's proposal, they are certainly adequate to provide the appellant with basis for appeal and to aid this Court in its review of this case. The appellant cannot show that it is entitled to a new trial based on this issue.
Asserted Errors of Fact
Where questions of fact are involved, the decision as to whether a motion for new trial should be granted lies within the sound discretion of the trial court, and the ruling will not be reversed upon appeal absent a showing of an abuse of discretion.[30] Thus, in reviewing a trial court's ruling on a motion for a new trial, an appellate court should view the evidence before it in a light favorable to the trial court's action, where the trial court's decision involves factual determinations.[31] An abuse of discretion connotes more than an error of judgment; rather, it indicates that the trial court's attitude was unreasonable, unconscionable, or arbitrary.[32]
The appellant argues that trial court should have found the appellee failed to rebut that appellant's prima facia showing of breach of contract. This argument cannot be sustained based on our previous finding that the trial court's judgment was not against the manifest weight of the evidence. The trial court did not find that the appellant established its breach of contract claim. Hence, the burden in the case never shifted to the appellee. Therefore, the trial court did not abuse its discretion in determining that New Haven was not entitled to a new trial based on this issue.
The appellant contends that the trial court abused its discretion by adopting, in large part, the appellee's Proposed Findings of Fact and Conclusions of Law, and that, consequently, it is entitled to a new trial. As we noted in the previous assignment of error, it is not improper for a trial court to adopt a party's proposed findings of fact and conclusions of law, as long as the document is reviewed to ensure that it is completely accurate.[33] Because we have already reviewed the trial court's findings, we hold that the trial court did not abuse its discretion by not granting a new trial based on this issue.
Based on the foregoing, the appellant's third assignment of error is not well-taken and is hereby denied.
Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
SHAW, P.J., and BRYANT, J., concur.
[1] Schuch v. Rogers (1996), 113 Ohio App.3d 718, 720.
[2] Midwest Specialties, Inc. v. Firestone Tire Rubber Co. (1988),42 Ohio App.3d 6, 8.
[3] Civ.R. 56(C); Horton v. Harwick Chemical Corp. (1995),73 Ohio St.3d 679, 686-87.
[4] Dresher v. Burt (1996), 75 Ohio St.3d 280, 293.
[5] Civ.R. 56(C).
[6] Dresher v. Burt, 75 Ohio St.3d at 293.
[7] Shaw v. J. Pollock Co. (1992), 82 Ohio App.3d 656, 659.
[8] Truetried Service Co. v. Hager (1997), 118 Ohio App.3d 78,87.
[9] Glickman v. Coakley (1984), 22 Ohio App.3d 49, 52; London Lancashire Indem. Co. of America v. Board of Comm'rs. Of ColumbianaCty. (1923), 107 Ohio St. 51, syllabus.
[10] (1990) 52 Ohio St.3d 232.
[11] Id. at 235.
[12] Id., citing Normandy Place Assoc. v. Beyer (1982), 2 Ohio St.3d 102,106.
[13] Clark v. Smith (1998), 130 Ohio App.3d 648, 659, citing Adkins v.Adkins (1988), 43 Ohio App.3d 95, at paragraph three of the syllabus.
[14] Shemo v. Mayfield Hts. (2000), 88 Ohio St.3d 7, 10; C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus.
[15] Ostendorf-Morris Co. v. Slyman (1982), 6 Ohio App.3d 46, 47.
[16] Seasons Coal Co. Inc. v. Cleveland (1984), 10 Ohio St.3d 77,80.
[17] Chubb v. Bureau of Workers' Comp. (1998), 81 Ohio St.3d 275,278.
[18] Ohio Farmers Ins. Co. v. Cochran (1922), 104 Ohio St. 427, syllabus.
[19] Id.
[20] Suchy v. Moore (1972), 29 Ohio St.2d 99, 102.
[21] Nicholas v. Yellow Cab Co. (1962), 116 Ohio App. 402, 412.
[22] Sanders v. Mt. Sinai Hospital (1985), 21 Ohio App.3d 249;Rhode v. Farmer (1970), 23 Ohio St.2d 82.
[23] Sanders, supra.
[24] State ex rel. Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78,81.
[25] Crim.R. 52(B).
[26] State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus.
[27] O'Connell v. Chesapeake Ohio R. Co. (1991), 58 Ohio St.3d 226,229-30.
[28] In re Adoption of Gibson (1986), 23 Ohio St.3d 170, 172, quotingWerden v. Crawford (1982), 70 Ohio St.2d 122, 124.
[29] Stone v. Davis (1981), 66 Ohio St.2d 74, 85.
[30] Verbon v. Pennese (1982), 7 Ohio App.3d 182, 184.
[31] Sanders v. Mt. Sinai Hospital (1985), 21 Ohio App.3d 249,253.
[32] Rock v. Cabral (1993), 67 Ohio St.3d 108, 112.
[33] Slyman, 6 Ohio App.3d at 47.