557 A.2d 210

**Khristin Therese GAVER et al.**

v.

**Roman J. HARRANT et al.**

No. 57, Sept. Term, 1988.

Court of Appeals of Maryland.

May 4, 1989.

Luiz R.S. Simmons (Auerbach & Simmons, both on brief), Silver Spring, for petitioners.

Michael F. Flynn, Jr. (Gerard J. Emig, Gleason & Flynn, Chtd., all on brief), Rockville, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

The issue presented is whether Maryland should adopt a cause of action permitting a minor child to recover money damages for the loss of parental society and affection when the parent is disabled by the negligence of a third party.

## I.

On April 6, 1985, a 2400–pound free-standing post and beam structure collapsed on Stephen Gaver, father of Khristin and John Gaver. Mr. Gaver was severely injured, sustaining permanent injuries to his back, body and limbs. He can no longer work, and will continue to experience physical pain indefinitely.

The accident occurred while Gaver was assisting his neighbor, Roman Harrant, in the construction of a post and beam trellis. Mr. and Mrs. Gaver, on behalf of themselves and their minor children, filed suit against Harrant in the Circuit Court for Frederick County. The complaint contained five counts, labeled negligence, strict liability, gross negligence, loss of consortium, and loss of society and affection—minor children.

Harrant moved to dismiss the minor children's claim on the ground that the cause of action was not recognized in Maryland. The court (Smith, J.) granted the motion, and the minor children appealed.[1] We granted certiorari before consideration by the Court of Special Appeals in order to consider this important question.

## II.

A cause of action allowing a minor child to recover for loss of a parent's society and affection was unknown at early common law. The doctrine of *pater familias* held that only the husband/father had legal capacity to sue for

---

1. The trial judge issued an order under Maryland Rule 2–602 that there was no just reason to delay entry of final judgment against the children.

injuries to members of his family. Note, *The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused By Tortious Injury to the Parent*, 56 B.U.L. Rev. 722, 742 (1976). The wife and children had no right to sue, apparently because they, as "inferior parties" in the relationship, had no rights to the services of the husband/father. Note, *Compensating the Child's Loss of Parental Love, Care, and Affection*, 1983 Ill.L.Rev. 293, 294 (1983).

Over time, the husband's cause of action for a wife's services gradually broadened into an action for loss of "consortium," which included "love, affection, protection, support, services, companionship, care, society, and ... sexual relations." *Id.* at 295. The scope of consortium claims was broadened in *Hitaffer v. Argonne Co.*, 183 F.2d 811 (D.C.Cir.1950), *cert. denied*, 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950), when the court held that the wife also had a loss of consortium claim when her husband was negligently injured. Since that time, most of our sister states have recognized a wife's loss of consortium claim. As to Maryland, *see Deems v. Western Maryland Ry.*, 247 Md. 95, 231 A.2d 514 (1967), discussed *infra*. *See also* Note, *supra*, 1983 Ill.L.Rev. at 296.

A cause of action for a minor child's loss of parental society and affection due to negligent injury was first recognized in *Berger v. Weber*, 82 Mich.App. 199, 267 N.W. 2d 124 (1978), *aff'd*, *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424 (1981). Five other states have since adopted the cause of action at common law.[2] *See Ferriter v. Daniel*

---

2. Legal commentators are also generally in favor of adoption of this cause of action. Dean Prosser has stated:

"[T]he interest of the child in proper parental care ... has run into a stone wall where there is merely negligent injury to the parent ... [I]t is not easy to understand and appreciate this reluctance to compensate the child who has been deprived of the care, companionship and education of his mother, or for that matter his father, through the defendant's negligence. This is surely a genuine injury, and a serious one, which has received a great deal more sympathy

*O'Connell's Sons, Inc.,* 381 Mass. 507, 413 N.E.2d 690 (1980); *Ueland v. Reynolds Metals Co.,* 103 Wash.2d 131, 691 P.2d 190 (1984); *Theama by Bichler v. City of Kenosha,* 117 Wis.2d 508, 344 N.W.2d 513 (1984); *Hay v. Medical Center Hosp. of Vermont,* 145 Vt. 533, 496 A.2d 939 (1985); *Hibpshman v. Prudhoe Bay Supply, Inc.,* 734 P.2d 991 (Alaska 1987). *See also, Salinas v. Ft. Washington Cabin Baggage Co.,* 725 S.W.2d 701 (Tex.1987) (court appears to implicitly accept the validity of the minor child's cause of action).

The great majority of courts, however, have refused to recognize the cause of action at common law. *See Barbera v. Brod–Dugan Co.,* 770 S.W.2d 318 (Mo.Ct.App.1989); *Vaughn v. Clarkson,* 324 N.C. 108, 376 S.E.2d 236 (1989); *Steiner by Steiner v. Bell Telephone Co.,* 358 Pa.Super. 505, 517 A.2d 1348 (1986), *aff'd,* 518 Pa. 57, 540 A.2d 266 (1988); *Still By Erlandson v. Baptist Hosp.,* 755 S.W.2d 807 (Tenn. Ct.App.1988); *Lewis v. Rowland,* 287 Ark. 474, 701 S.W.2d 122 (1985); *Zorzos v. Rosen by and through Rosen,* 467 So.2d 305 (Fla.1985); *Huter by Huter v. Ekman,* 137 Ill.App.3d 733, 92 Ill.Dec. 369, 484 N.E.2d 1224 (1985); *Sanders v. Mt. Sinai Hosp.,* 21 Ohio App.3d 249, 487 N.E.2d 588 (1985); *W.J. Bremer Co. Inc. v. Graham,* 169 Ga.App. 115, 312 S.E.2d 806 (1983); *Versland v. Caron Transport,* 206 Mont. 313, 671 P.2d 583 (1983); *DeAngelis v. Lutheran Medical Center,* 84 A.D.2d 17, 445 N.Y.S.2d 188 (1981), *aff'd,* 58 N.Y.2d 1053, 462 N.Y.S.2d 626, 449 N.E.2d 406 (1983); *Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or. 543, 652 P.2d 318 (1982); *Salin v. Kloempken,* 322 N.W.2d 736 (Minn.1982); *Morgel v. Winger,* 290 N.W.2d 266 (N.D.1980); *Hinde v. Butler,* 35 Conn.Sup. 292, 408 A.2d 668 (1979); *Bradford v. Union*

---

from the legal writers than from the judges." W. Prosser, The Law of Torts § 125, at 896 (4th ed. 1971).

*See also* Harper, James and Gray, The Law of Torts § 8.8 (May 1988 Supp.); Note, *A Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused By Tortious Injury to the Parent,* 56 B.U.L. Rev. 722 (1976).

*Electric Co.*, 598 S.W.2d 149 (Mo.App.1979); *Borer v. American Airlines, Inc.*, 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858 (1977); *Kelly v. United States Fid. & Guar. Co.*, 353 So.2d 349 (La.App.1977), *app. dismissed*, 357 So.2d 1144 (La.1978); *General Electric Co. v. Bush*, 88 Nev. 360, 498 P.2d 366 (1972); *Russell v. Salem Transportation Company*, 61 N.J. 502, 295 A.2d 862 (1972); *Hoffman v. Dautel*, 189 Kan. 165, 368 P.2d 57 (1962); *Pleasant v. Washington Sand & Gravel Co.*, 262 F.2d 471 (D.C.Cir. 1958); *Juene v. Del. E. Webb Const. Co.*, 77 Ariz. 226, 269 P.2d 723 (1954), *overruled on other grounds, City of Glendale v. Bradshaw*, 108 Ariz. 582, 503 P.2d 803 (1972).

### (A)

Courts rejecting the cause of action have generally followed one of three lines of reasoning. Some courts, on public policy grounds, have concluded that the legislature, and not the court, is the governmental body best suited to weigh the burdens of the proposed cause of action against the benefits. For example, in *Duhan v. Milanowski*, 75 Misc.2d 1078, 348 N.Y.S.2d 696, 702 (1973), the court held that

> "[t]he principal objection of this court to the [cause of action], however, is the complete inadequacy of our judicial system to solve such a complex issue. Untested complaints and appeals are dull and clumsy tools to fashion a new legal form. Yet every facet of that form must ultimately be shaped by an Appellate Court decision. Decades can pass before the new principle of law is finally formed. The matter requires study in depth and resolution by a comprehensive statutory enactment."

*Accord, Zorzos, supra; Huter, supra; Steiner, supra.*

Other courts have rejected the cause of action based on their own perception of the necessity of its adoption. For example, in *Salin v. Kloempken*, 322 N.W.2d 736, 742 (Minn.1982), the court stated that

> "... based on our own precedent and on considerations of public policy and the results that would obtain upon

recognition of this type of claim, such as the additional burden placed on society through increased insurance costs and the added expense of litigation and settlement, and in the interest of limiting the legal consequences of a wrong to a controllable degree, a new cause of action on behalf of a child for the loss of parental consortium should not be recognized."

*Accord, Hoffman, supra; Russell, supra; Borer, supra.*

Other courts rejecting the child's cause of action have declined to consider policy grounds, focusing instead upon strictly legal considerations. In *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or. 543, 652 P.2d 318 (1982), the court noted that:

> "No doubt there are genuine wrongs that courts are ill suited to set right, and others that do not merit the social costs of litigation. But if these costs are to be the reason for denying an otherwise meritorious cause of action, that is one judgment to be made by legislatures rather than by courts. Courts exist to serve whatever rights people have, ...; it is not for them to weigh or 'balance' their own institutional concerns against the merits of such a right."

*   *   *   *   *   *

> "We therefore lay aside the pragmatic arguments adduced for and against a child's damage action for the disablement of a parent and turn to the question how plaintiff's claim relates to other comparable claims." *Id.* at 323–24 (footnote omitted).

The court discussed analogous causes of action available under existing state law, and noted that the child's claim involved two characteristics which are somewhat disfavored in tort law: 1) "the injury to the plaintiff occurs as a consequence of injury to another person, and [2)] this consequential injury is to the plaintiff's psychic interests rather than to his physical person or tangible property." *Id.* at 321. The court ultimately held that the main obstacle

to adoption of the cause of action was that, under Oregon law,

"... ordinarily negligence as a legal source of liability gives rise only to an obligation to compensate the person immediately injured, not anyone who predictably suffers loss in consequence of that injury, unless liability for that person's consequential loss has a legal source besides its foreseeability." *Id.* at 333.

## (B)

Courts which have adopted the child's loss of parental society and affection cause of action have generally started from the premise that the child suffers a real and serious loss when a parent is injured. The Wisconsin Supreme Court, in *Theama, supra,* noted that:

"A child has an interest in the society and affection of his parent ... When the child is deprived of his parents' society, care, protection and affection he suffers a real injury ... [T]he child's loss ... deprives him of the essentials for a healthy development and thus results in a real injury to the child." 344 N.W.2d at 516.

Courts allowing the child's recovery have also responded to the several public policy concerns raised by adoption of the cause of action, offering solutions to these problems, or holding that the benefits to be gained by recognizing the cause of action outweigh the burdens. A problem commonly cited by courts rejecting the cause of action is the burden of multiple legal actions arising from a single tortious act. *See, e.g., Salin v. Kloempken,* 322 N.W.2d 736, 739 (Minn. 1982). Some courts adopting the cause of action, however, have responded that compulsory joinder can easily solve this problem. *See, e.g., Hay, supra,* 496 A.2d at 943. Others have indicated that the burden posed by multiple actions is outweighed by the benefit of compensation to the child. *See Ueland, supra,* 691 P.2d at 193. ("[t]he rights of a new class of tort plaintiffs should be forthrightly judged on their own merits, rather than engaging in gloomy

speculation as to where it will all end.") (quoting *Berger v. Weber,* 82 Mich.App. 199, 210, 267 N.W.2d 124, 129 (1978)).

Courts which have rejected the cause of action also cite the danger of double recovery. In *Salin, supra,* the court noted that "there is actually a ... threat of double recovery by the child because juries may ... already indirectly factor in a child's emotional loss through an award to the parent." 322 N.W.2d at 740. On the other hand, courts adopting the cause of action hold that careful jury instructions can avoid this problem. *See Hay, supra,* 496 A.2d at 944. They also note that if such compensation is valid, it is better to allow the claim to be separately evaluated by the jury:

"Rather than having juries make blind calculations of the child's loss in determining an award to the parent, a child's loss could be openly argued in court and the jury could be instructed to consider the child's loss separately. The award would accrue directly to the child rather than be lumped in with that of the parent who may or may not spend it for the child's benefit." *Berger v. Weber, supra,* 303 N.W.2d at 427.

Another perceived drawback to the cause of action is the uncertainty and remoteness of damages. "The intangible nature of the child's loss makes it difficult to assess damages and provides a further reason against judicial recognition of the cause of action." *Salin, supra,* 322 N.W.2d at 740. Courts adopting the cause of action generally meet this objection in one of two ways. First, they say that the damages in the child's action are no more remote or uncertain than in similar claims, such as that for spousal consortium. *See, Berger, supra,* 303 N.W.2d at 427. Second, at least one court has held that

"[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Theama, supra,* 344 N.W.2d at 519 (quoting C. McCormick, Law of Damages § 27, at 102 (1935)).

Courts rejecting the cause of action have also asserted that money damages do not truly compensate the child's loss. The California Supreme Court noted:

"Loss of consortium is an intangible, nonpecuniary loss; monetary compensation will not enable plaintiffs to regain the companionship and guidance of a mother; it will simply establish a fund so that upon reaching adulthood, when plaintiffs will be less in need of maternal guidance, they will be unusually wealthy men and women. To say that plaintiffs have been 'compensated' for their loss is superficial; in reality they have suffered a loss for which they can never be compensated; they have obtained, instead, a future benefit essentially unrelated to that loss." *Borer, supra,* 563 P.2d at 862.

However, courts adopting the cause of action respond that this is a problem common to many tort actions. The Wisconsin Supreme Court was

". . . unswayed by such an argument. Although a monetary award may be a poor substitute for the loss of a parent's society and companionship, it is the only workable way that our legal system has found to ease the injured party's tragic loss. We recognize this as a shortcoming of our society, yet we believe that allowing such an award is clearly preferable to completely denying recovery." *Theama, supra,* 344 N.W.2d at 520.

Another concern is that the child's cause of action will lead to similar actions for siblings, grandparents, and parent-substitutes. Courts adopting the cause of action generally respond that the action can be limited by the courts. A similar concern is the cause of action's potential for greatly expanding the liability of the tortfeasor. The New Jersey Supreme Court noted that "[i]f the claim were allowed there would be a substantial accretion of liability against the tortfeasor arising out of a single transaction." *Russell, supra,* 295 A.2d at 864. A related concern, of course, is the imposition of the increased costs upon society:

"Realistically, the burden of paying damage awards will be borne by the public generally in increased insurance

premiums or, alternatively, in the enhanced danger that accrues from the greater number of people who may choose to go without insurance. Moreover, we must take into account the cost of administration of a system to determine and pay consortium awards. Since virtually every injury to a parent with minor children would be accompanied by a claim for loss of parental consortium, the expenses of settling or litigating these claims would be sizable.... The social cost resulting from the expenditure of valuable judicial resources in litigating these claims would be substantial." *Salin, supra,* 322 N.W.2d at 741 (citation omitted).

Courts adopting the cause of action have acknowledged the reality of these problems, but have held that "it is the rights of the new class of plaintiffs, and the desire to see justice made available within our legal system, which are of paramount importance." *Hay, supra,* 496 A.2d at 943. *See also, Ueland, supra,* 691 P.2d at 193. These courts have also held that the burdens of increased costs to society are offset by the benefits:

"[w]e believe that any burden to society is offset by the benefit to the child, who through compensation may be able to adjust to his or her loss with stability. Ultimately, society will benefit as well, since ideally the child will become a normal adult who is capable of functioning as such in his or her own social setting.... As one writer noted, 'The family relationship "is the relationship on which all society must depend for endurance, permanence, and well-being."'" *Theama, supra,* 344 N.W.2d at 521 (quoting Note, *supra,* 56 B.U.L.Rev. at 741 (footnote omitted)).

### (C)

Courts allowing a minor child to recover for loss of parental society and affection due to negligent injury to the parent have also offered a number of affirmative reasons for their decisions. The analogy to a spousal consortium claim has been argued by all courts recognizing the cause of action. In *Ferriter v. Daniel O'Connell's Sons, Inc.,*

381 Mass. 507, 413 N.E.2d 690, 692 (1980), the court asserted "that a minor child has a strong interest in his parent's society, an interest closely analogous to that of the wife in [a spousal consortium claim] ... We are skeptical of any suggestion that the child's interest in this setting is less intense than the wife's."

Another argument for adopting the cause of action is the analogy between the child's claim for loss of parental society and affection in a wrongful death action and a similar claim when the parent is injured. The Michigan Supreme Court, in *Berger, supra,* held that "the real anomaly is to allow a child's recovery for the loss of a parent's society and companionship when the loss attends the parent's death but to deny such recovery when the loss attends the parent's injury." 303 N.W.2d at 426.

Other reasons urged in support of the cause of action are the current invalidity of the doctrine of *pater familias, Ferriter, supra,* 413 N.E.2d at 692–93, and a growing trend toward recognition of children's rights. *See Theama, supra,* 344 N.W.2d at 517 ("Society's increasing awareness of the child's humanity has prompted the extension of numerous legal rights.").

Courts adopting the cause of action have also used a tort law line of reasoning. For example, the Supreme Court of Wisconsin reviewed state tort law, noting that it had first recognized a spousal consortium right in the wife, and then had allowed a parent to recover for loss of society and affection of a negligently injured minor child. *Theama, supra,* 344 N.W.2d at 515. The court held that "[i]t is only logical that the next step in this progression is to protect the child's interest in the parent-child relationship." *Id.* at 518. *See also Ueland, supra,* 691 P.2d at 192 (state statute allows parent to recover for loss of consortium for injury to a minor child).

### III.

The proposed cause of action has never been recognized at Maryland common law. However, as we have often

noted, the common law of this State is "subject to judicial modification in the light of modern circumstances or increased knowledge." *Ireland v. State,* 310 Md. 328, 331, 529 A.2d 365 (1987). *See also, Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 140, 497 A.2d 1143 (1985); *Jones v. State,* 302 Md. 153, 161, 486 A.2d 184 (1985); *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983); *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981).

Indeed, we have not hesitated to change the common law by adopting a new cause of action where such a course was compelled by changing circumstances. Even the doctrine of *stare decisis* does not prevent us from "changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge, that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." *Harrison v. Mont. Co. Bd. of Educ.,* 295 Md. 442, 459, 456 A.2d 894 (1983). For example, in *Phipps v. General Motors Corp.,* 278 Md. 337, 363 A.2d 955 (1976), we adopted the theory of strict liability in tort as expressed in § 402A of the Restatement (Second) of Torts. In *Kelley v. R.G. Industries, Inc., supra,* we recognized a cause of action in strict liability against marketers and manufacturers for damages caused by "Saturday Night Special" handguns. *See also, Boblitz v. Boblitz, supra,* (authorizing negligence action by one spouse against the other); *Moxley v. Acker,* 294 Md. 47, 447 A.2d 857 (1982) (changing common law to permit action of forcible detainer even if force not present); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981) (recognizing tort of abusive or wrongful discharge); *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978) (creating exception to interspousal immunity for outrageous intentional torts); *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977) (adopting tort of intentional infliction of emotional distress).

Adoption of a new cause of action involves serious public policy concerns. Thus, "in considering whether a long-established common law rule—unchanged by the legislature

and thus reflective of this state's public policy—is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly." *Harrison, supra*, 295 Md. at 460, 456 A.2d 894. We have therefore been "particularly reluctant to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State." *Id.* In *Harrison v. Mont. Co. Bd. of Educ., supra*, we were unable to say that modern circumstances compelled adoption of comparative negligence, and held that the decision involved "fundamental and basic policy considerations more properly to be addressed by the legislature." *Id.* at 463, 456 A.2d 894. In *Felder v. Butler*, 292 Md. 174, 438 A.2d 494 (1981), we declined to alter the existing common law rule and hold liquor vendors liable for injuries negligently caused by an intoxicated patron to an innocent third party. *See also, Condore v. Prince George's Co., supra* (declining to create a cause of action against wife for payment of husband's necessaries); *Murphy v. Baltimore Gas & Elec.*, 290 Md. 186, 428 A.2d 459 (1981) (refusing to change common law rules as to duty of care owed a trespasser by property owner); *Austin v. City of Baltimore*, 286 Md. 51, 405 A.2d 255 (1979) (refusing to abrogate doctrine of governmental tort immunity); *Howard v. Bishop Byrne Home*, 249 Md. 233, 238 A.2d 863 (1968) (declining to abrogate charitable immunity in tort actions); *White v. King*, 244 Md. 348, 223 A.2d 763 (1966) (declining to change common law rule of *lex loci delicti* in tort actions).

Therefore, while we are empowered to adopt the proposed cause of action, we first consider whether the existing rule—which does not allow a child's claim for damages for the loss of parental society and affection due to negligent injury—is "unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." *Harrison, supra*, 295 Md. at 459, 456 A.2d 894. In this regard, it is recognized that "judges are frequently called upon to discern the dictates of sound social policy and

human welfare based on nothing more than their own personal experience and intellectual capacity." *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 606, 386 A.2d 1216 (1978). In this endeavor, we consider the public policy concerns raised by the parties and by the other courts which have grappled with this issue.[3]

First, the alleged uncertainty and remoteness of damages becomes a more important factor when those damages are to compensate a secondary tort victim (recovery for injury to someone other than the plaintiff) and are also intangible (not physical or property damage). In this regard, we note that courts are generally willing to tolerate substantial uncertainty in calculating damages to compensate the primary tort victim. The argument that money is a poor substitute and that the value of pain and anguish is difficult to determine is plainly inadequate to deny recovery to one who has been crippled or disfigured. When the plaintiff is not the primary victim, however, such objections become more significant. Therefore, considerations which would not deter a court from compensating a primary victim may support a refusal to further expand the scope of liability. *See Berger v. Weber, supra,* 303 N.W.2d at 436 (Levin, J., dissenting).

The claim that money cannot truly compensate for the child's loss also takes on greater significance in considering whether to adopt an entirely new cause of action. "[I]n this context the inadequacy of monetary damages to make whole the loss suffered, considered in light of the social cost of paying such awards, constitutes a strong reason for refusing to recognize the asserted claim." *Borer v. American Airlines, Inc.,* 138 Cal.Rptr. 302, 563 P.2d 858, 862 (1977).

---

**3.** Appellants' reliance on *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984) is misplaced. In *Jones,* we held that damages based on negligent sterilization must be offset by the benefits parents derive from a child's aid, society and comfort. That decision is in no way meant to imply that loss of such benefits could be the basis of recovery in a negligence action.

The likelihood of further expansion of consortium-type claims must also be taken into account. We created a joint husband-wife cause of action for loss of consortium in *Deems v. Western Maryland Ry.*, 247 Md. 95, 231 A.2d 514 (1967). There, the legal entity concept which we adopted caused many of the objections to a separate, new cause of action for the wife to "disappear or become less forceful." *Id.* at 114, 231 A.2d 514. We said, in recognizing the joint right, that it did not involve the "right of other members of the injured person's family to recover for intangible losses, with possible inordinate expansion of a defendant's liability for damage resulting from his negligence; the right is confined to injury to the joint relational interest of the spouses." *Id.*

Absent truly compelling circumstances, we are also concerned with the substantial expansion of tortfeasor liability and the accompanying societal costs that will be imposed by this new cause of action. As earlier observed, it contains elements which are generally not favored under tort law. There are few other instances where a secondary tort victim has been permitted to recover for a negligently inflicted injury to a relational interest unaccompanied by physical injury to himself.

We think the arguments advanced for the cause of action are unpersuasive in light of Maryland law. The analogy to spousal consortium claims has been criticized by other courts, generally based on the significant differences between the spousal relationship and the parent-child relationship. *See Salin v. Kloempken, supra* (sexual relations); *Borer v. American Airlines, Inc., supra* (same); *Steiner by Steiner v. Bell Telephone Co., supra* (a contractual relationship; spouses generally viewed as a united "whole"). In Maryland, the distinction is even more significant since, in *Deems v. Western Maryland Ry., supra,* we did not create a new loss of consortium cause of action for the wife; instead, we created a joint husband-wife cause of action for loss of consortium. This, we said, is more than simply requiring joinder of claims, because the loss of

consortium claim belongs to neither spouse alone, but to the "entity." "They are treated in legal contemplation as the partners they are in fact. The wife does not receive the separate right to sue, but she is accorded a new right to recover as part of the marital entity." 247 Md. at 108, 231 A.2d 514. We recognized in *Deems* that, "there is, in a continuing marital relationship, an inseparable mutuality of ties and obligations, of pleasures, affection and companionship which makes that relationship a factual entity." *Id.* While we recognize the importance of the parent-child relationship, it does not constitute a legal and factual entity like that involved in *Deems.*

Finally, appellants argue that because Maryland's Wrongful Death Act[4] provides that a minor child may collect damages for loss of parental society and companionship when a parent is killed, a similar action should be recognized when a parent is disabled. We think this analogy is unpersuasive. Courts which have rejected the loss of parental society and affection cause of action have noted that wrongful death actions were created by statute, and that the creation of this new cause of action should similarly be left to the legislature. *See, e.g., Zorzos v. Rosen By and Through Rosen,* 467 So.2d 305 (Fla.1985). The analogy is also unpersuasive in light of the policy reasons underlying loss of society damages in wrongful death. Such damages have been allowed generally because the "pecuniary loss" rule, if strictly applied, could result in no recovery at all if the victim was an unproductive member of society, very old or young, or disabled. *See Borer v. American Airlines, Inc., supra,* 563 P.2d at 865 ("The services of children,

---

4. Maryland's Wrongful Death Act, Maryland Code (1974, 1984 Repl. Vol.) § 3–904(d) of the Courts and Judicial Proceedings Article, provides that, in the case of death of a parent of a minor child,

    "... the damages awarded ... are not limited or restricted by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable."

elderly parents, or non-working spouses often do not result in measurable net income to the family unit, yet unquestionably the death of such a person represents a substantial 'injury' to the family."); *Norwest v. Presbyterian Intercommunity Hosp., supra,* 652 P.2d at 331.

We, of course, are not unmindful of the importance of the parent-child relationship, nor of the magnitude of loss suffered by a child when a parent is seriously injured. We conclude, however, that adoption of the proposed cause of action is not compelled by changing circumstances nor by a pressing societal need. The existing rule has not "become unsound in the circumstances of modern life." *Harrison, supra,* 295 Md. at 459, 456 A.2d 894. We therefore decline to adopt the cause of action at this time, and, "in the present state of the law, we leave any change in the established doctrine to the Legislature." *White v. King, supra,* 244 Md. at 355, 223 A.2d 763.

JUDGMENT AFFIRMED, WITH COSTS.

Dissenting opinion by ADKINS, J.

ADKINS, judge, dissenting.

I agree with the majority that "adoption of a new cause of action involves serious public policy concerns," and that this Court should not " 'alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State.' " *Gaver v. Harrant,* 316 Md. 17, 28–29, 557 A.2d 210, 216 (1989) (quoting *Harrison v. Montgomery Co. Bd. of Educ.,* 295 Md. 442, 460, 456 A.2d 894, 903 (1983)); *see also, e.g., Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 141, 497 A.2d 1143, 1151 (1985). I respectfully dissent because I believe that the legislature's policy towards children and the importance of the family in Maryland, both embodied in various statutes enacted by that body, indicate that adoption of a cause of action for a minor child's loss of parental society and companionship when the parent is injured by the tortious act of a third party is wholly consistent with the public policy of this State.

When this Court has refused to change or modify the common law, its decision has been based upon a clear indication from the legislature that to do so would be contrary to the public policy of this State. For example, in *Austin v. City of Baltimore*, 286 Md. 51, 405 A.2d 255 (1979), we refused to judicially abrogate the doctrine of municipal immunity from tort liability. 286 Md. at 54, 405 A.2d at 257. Because the General Assembly had refused to abrogate the doctrine "in the face of repeated reminders of its role in the matter in the opinions of this Court," we determined that the public policy of Maryland did not favor our taking action on the matter. *Id.* at 55–58, 405 A.2d at 257–259. In his concurring opinion, Judge Eldridge pointed out that the issue of State immunity had "consistently been a legislative matter in Maryland," and that the legislature, three years previously, had decided that the State's immunity should be abrogated solely in contract actions. *Id.* at 70, 405 A.2d at 265 (Eldridge, J., concurring). Thus, the public policy with regard to immunity in tort actions was particularly clear.

In *Howard v. Bishop Byrne Home*, 249 Md. 233, 238 A.2d 863 (1968), our decision not to abrogate the doctrine of charitable immunity from tort liability was based upon the fact that the "General Assembly [had] completely investigated the immunity question, and the present statutes are tangible evidence that the Legislature arrived at a solution which it deemed satisfactory." 249 Md. at 241–242, 238 A.2d at 868. Legislative policy was also clear in our decision not to create dram shop liability. *Felder v. Butler*, 292 Md. 174, 438 A.2d 494 (1981). There, we determined that the failure of the legislature to create dram shop liability in the face both of our refusal to do so thirty years previously and of the growing number of states to create such an action since our decision indicated that the public policy of Maryland was against the trend. 292 Md. at 183–184, 438 A.2d at 499. Similarly, in *Harrison, supra*, we decided not to replace the contributory negligence doctrine with a comparative fault system because the position of the legislature

was clearly against the change. Between 1966 and 1982, the legislature had declined to enact twenty-one bills which would have done precisely what was asked of us in *Harrison*, 295 Md. at 462, 456 A.2d at 904. This, we noted, was an indication of the legislature's intention to retain the contributory negligence doctrine. *Id.*

On the other hand, we have not hesitated to change the common law when "it has become unsound in the circumstances of modern life." *Kline v. Ansell*, 287 Md. 585, 590, 414 A.2d 929, 931 (1980). Often, that conclusion has emanated in whole or in part from legislative action setting public policy. We have, for example, determined that various common law doctrines were unsound in light of the legislature's passage and subsequent voter ratification of the Equal Rights Amendment, Article 46 of the Maryland Declaration of Rights. *See Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d 506 (1983) (interspousal immunity rule); *Condore v. Prince George's Co.*, 289 Md. 516, 425 A.2d 1011 (1981) (necessaries doctrine); *Kline, supra* (cause of action for criminal conversion).

In *Kelley, supra*, we imposed strict liability upon the manufacturers and marketers of "Saturday Night Specials." We determined that the right to possess and carry certain handguns was sanctioned by the legislature. 304 Md. at 144, 497 A.2d at 1152-1153. But one class of handguns, the "Saturday Night Special," was not protected under the statutory provisions covering other handguns. *Id.* at 144, 497 A.2d at 1153. Thus, public policy did not oppose, but, in fact, favored the imposition of strict liability for injuries caused by their use. *Id.* at 157, 497 A.2d at 1159.[1] These decisions make it clear that we will change or modify the common law when public policy calls for or is consistent with action. I believe action is called for in this

---

1. Our decision in *Kelley* has been overruled by the General Assembly and the citizens of Maryland in the passage of Chapter 533 of the Acts of 1988 as ratified in a public referendum. *See* Md.Code, Art. 27, § 36-I(h) (1989 Advance Code Serv.). Public policy in this area, therefore, seems to have changed.

case; public policy clearly supports our adoption of a cause of action for a minor's loss of parental society and companionship resulting from the tortious act of a third party that causes injury to the parent.

At common law, a husband/father had a proprietary interest in the services of his wife and minor children. W. Prosser, *The Law of Torts* § 124, at 916 (W. Keeton 5th ed. 1984); *see also* Note, *Child's Right to Sue for Negligent Disruption of Parental Consortium,* 22 Washburn L.J. 78, 81–82 (1982) ("A man's wife and children were perceived as chattel"). When a wife or minor child was injured by the tort of a third party, the husband/father was entitled to recover from the tortfeasor for lost services; this action stemmed from the common law action a master had for the lost services of an injured servant. W. Prosser, § 125, at 931–935. Over the years, the nature of recovery for "loss of consortium" changed from recovery limited to the loss of services to a broader remedy of damages for loss of society, affection, companionship, comfort, and in the case of injury to the wife, sexual relations. *Id.* § 125, at 931; *see also* 2 F. Harper, F. James & O. Gray, *The Law of Torts* § 8.8, at 536 (2d ed. 1986); Comment, *Who Should Recover for Loss of Consortium?,* 35 Me.L.Rev. 295, 300 (1983). Thus, although the roots of a consortium claim lie "in the father's [or husband's] proprietary right to the child's [or wife's] services, the origin of the action is of minimal significance today." Note, *The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent,* 56 B.U.L.Rev. 722, 731 (1976) [footnote omitted]. At common law, neither the wife nor children were entitled to pursue a similar cause of action, with respect to injury to the husband/father. W. Prosser, § 125, at 931, 935.

Passage of Married Womens' Acts in Maryland[2] and other states around the close of the nineteenth century

---

2. *See* Ch. 457 of the Acts of 1898, now codified as Md.Ann.Code (1984 Repl.Vol.), Family Law Art. §§ 4–203—4–205.

gave women additional rights, including the right to sue for torts committed against them, engage in business, and contract, although these statutes were at first construed in a strained and grudging fashion. *See generally Boblitz, supra,* 296 Md. at 244–251, 462 A.2d at 507–510; *Lusby v. Lusby,* 283 Md. 334, 339–346, 390 A.2d 77, 79–83 (1978).

In *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A.2d 514 (1967), this Court noted that the "medieval concept" of the common law regarding the inability of a woman to sue for loss of consortium was not totally "in accord with modern legal thought." 247 Md. at 107, 231 A.2d at 521. In that case the Court recognized that it is the marital relationship or entity that is adversely affected when one of the spouses is physically injured by a third party's tortious act. *Id.* at 108, 231 A.2d at 522. *Deems* changed the common law to permit a joint action, in which both spouses can recover for the injury to the marital relationship. *Id.* at 115, 231 A.2d at 525. Almost a decade later, we noted it was "clear that the underlying purpose and rationale of the joint action is to compensate the *individual* persons who form that relationship for the personal injury which *they both* sustain." *Phipps v. General Motors Corp.,* 278 Md. 337, 355, 363 A.2d 955, 965 (1976) [emphasis added]. Thus, injury to the marital entity results in a compensable injury to two people for which this Court has required that they bring a joint action.

As in the case of women, recognition of rights of children has been slow in coming. This Court has long permitted a parent (a father only at early common law) to recover for loss of a minor child's services, society, etc. *See, e.g., Hudson v. Hudson,* 226 Md. 521, 174 A.2d 339 (1961); *Seglinski v. Baltimore Copper Co.,* 149 Md. 541, 131 A. 774 (1926); *Hussey v. Ryan,* 64 Md. 426, 2 A. 729 (1886); *County Commissioners v. Hamilton,* 60 Md. 340 (1883); *see also* Family Law Art., §§ 5–205, 5–206. Of course, no similar action presently exists for a minor child. *See* W. Prosser, *supra,* § 125, at 935 ("The interest of the child in proper parental care and affection . . . ran into a stone wall

where the defendant was merely negligent in causing injury to the parent."); Pound, *Individual Interests in the Domestic Relations*, 14 Mich.L.Rev. 177, 185 (1916) (there was no legal right at common law to protect a child's interest in the society and affection of a parent).

Nevertheless, in the second half of this century, courts have recognized that minor children are not mere chattels, but persons also entitled to many of the same constitutional protections and freedoms as adults. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (due process); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (criminal procedure—proof beyond a reasonable doubt); *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (freedom of speech); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (Sixth Amendment rights to counsel, confrontation, cross-examination, and Fifth Amendment right not to incriminate oneself). Furthermore, the General Assembly of Maryland has increasingly recognized the social importance of the family, the need to protect this institution, and a particular need to protect children.

Section 4-401 of the Family Law Article establishes the General Assembly's policy with regard to families with children:

The General Assembly declares:

(1) that it is the policy of this State to promote family stability, to preserve family unity, and to help families achieve and maintain self-reliance by:

(i) responding to financial and family crisis through direct provision of family counseling and supportive services; and

(ii) referral to appropriate community resources; and

(2) this State has the responsibility to provide services that prevent the kind of family dissolution and breakdown that requires protective services or out-of-home placement.

Also, in an attempt to preserve the family unit, the legislature has declared that the rights of natural parents may be terminated only upon a finding by a court that to do so is, by clear and convincing evidence, in the best interests of the child. Family Law Art., § 5–313(a) (1988 Cum.Supp.).

Numerous sections of the Family Law Article look to the protection of minor children. Parents are, by statute, made jointly and severally responsible for their child's "support, care, nurture, welfare, and education...." *Id.* § 5–203(b)(1); *see also id.* § 5–1002(b)(2) (providing children born out of wedlock with the same rights). Children are protected from child abuse and neglect. *Id.* § 5–701 *et seq.* (1988 Cum.Supp.). Penalties are provided for leaving young children unattended. *Id.,* § 5–801 (1988 Cum.Supp.). In the case of children placed in child or foster care, the General Assembly has voiced its special concern:

(a) The General Assembly declares that:

(1) minor children are not capable of protecting themselves; and

(2) when a parent has relinquished the care of the parent's minor child to others, there is a possibility of certain risks to the child that require compensating measures.

(b) It is the policy of this State:

(1) to protect minor children whose care has been relinquished to others by the children's parent;

(2) to resolve doubts in favor of the child when there is a conflict between the interests of a minor child and the interests of an adult; and

(3) to encourage the development of day care services for minor children in a safe, healthy, and homelike environment.

*Id.* § 5–502.

The common law with regard to the manner in which custody of children is granted to parents upon their divorce has been changed. At common law, the father was entitled to custody of his minor children. *DeGrange v. Kline,* 254

Md. 240, 242, 254 A.2d 353, 354 (1969). The standard upon which custody of children is now granted to parents is what a court finds to be "in the best interests of the particular child and most conducive to his welfare." *Ross v. Hoffman*, 280 Md. 172, 174, 372 A.2d 582, 585 (1977); *see also* Family Law Art. § 9–202(a) (Maryland Uniform Child Custody Jurisdiction Act provides guidelines for resolving custody disputes, all geared toward the best interests of children); *Taylor v. Taylor*, 306 Md. 290, 303, 508 A.2d 964, 970 (1986).

This Court has recognized the importance of a stable family. In *Frye v. Frye*, 305 Md. 542, 505 A.2d 826 (1986), we were asked to abrogate the parent-child immunity doctrine. We discussed the purpose of the doctrine:

"The doctrine is founded upon public policy, and is designed to preserve the peace and harmony of the home, under normal conditions, as well as to recognize the authority of the parent, under normal conditions, responsible for the maintenance of the home."

305 Md. at 550, 505 A.2d at 830 (quoting *Yost v. Yost*, 172 Md. 128, 134, 190 A. 753, 756 (1937)). We declined to abrogate the doctrine and the important social policy embodied within it. *Id.* at 567, 505 A.2d at 839. The importance and worth of children were also evident in *Jones v. Malinowski*, 299 Md. 257, 473 A.2d 429 (1984), a wrongful birth case, where we required that the parents' recovery be offset by the nonpecuniary benefits, such as society and companionship, inuring to them because of the birth of the child. 299 Md. at 272–274, 473 A.2d at 436–437. Therefore, in Maryland today, the importance of family relationships and the benefits of a healthy and stable family atmosphere inuring to both parents and children are recognized and protected by law.

Thus, the development of the common law, the needs of contemporary society, and public policy as enunciated by the General Assembly, all favor the cause of action that the Gavers seek to establish. The public policy factor is made especially clear in § 3–904(d) of the Courts and Judicial

Proceedings Article, which we shall visit shortly. Before doing that, however, it is useful to reflect on the fact that the harm done a minor child through loss of parental consortium is genuine and substantial.

Although the extent of a child's injury may vary depending upon the physical injury incurred by a parent because of the tortious act of a third party, there can be no doubt that there is a real injury suffered by a child in those circumstances.

"A child has an interest in the society and affection of his parent. Furthermore, the society, education, protection and love of a parent is necessary for the child's welfare and development. 'The child, for the full and harmonious development of his personality, needs love and understanding.' When the child is deprived of his parents' society, care, protection and affection he suffers a real injury.... Similarly, the child's loss of his parents' love, society and protection deprives him of the essentials for a healthy development and thus results in a real injury to the child.

"Protection of the child against this type of injury to the family relationship is equally important to the state. Since the character of the child has an impact on society 'it is of the highest importance to the child and society that its rights to receive the benefits derived from its mother [or father] be protected.' "

*Theama By Bichler v. City of Kenosha,* 117 Wis.2d 508, 515, 344 N.W.2d 513, 516 (Wis.1984) (quoting comment, *The Child's Claim for Loss of Consortium Damages: A Logical and Sympathetic Appeal,* 13 San Diego L.Rev. 231, 237–238 (1975) [footnotes omitted; brackets in original]. Recently, many courts have recognized this loss and have permitted children to recover for loss of a parent's consortium when the parent is tortiously injured by a third party. *See, e.g., Leach v. Newport Yellow Cab, Inc.,* 628 F.Supp. 293 (S.D.Ohio 1985), *aff'd,* 815 F.2d 704 (6th Cir.1987); *Hibpshman v. Prudhoe Bay Supply, Inc.,* 734 P.2d 991 (Alaska 1987); *Weitl v. Moes,* 311 N.W.2d 259 (Iowa 1981)

42

(en banc), *modified, Audubon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf R.R. Co.,* 335 N.W.2d 148 (Iowa 1983) (en banc); *Dearborn Fabricating & Eng'g Corp. v. Wickham,* 532 N.E.2d 16 (Ind.Ct.App.1988); *Ferriter v. Daniel O'Connell's Sons, Inc.,* 381 Mass. 507, 413 N.E.2d 690 (1980); *Berger v. Weber,* 411 Mich. 1, 303 N.W.2d 424 (1981), *aff'g,* 82 Mich.App. 199, 267 N.W.2d 124 (1978); *Salinas v. Fort Worth Cab & Baggage Co.,* 725 S.W.2d 701 (Tex.1987); *Hay v. Medical Center Hosp. of Vt.,* 145 Vt. 533, 496 A.2d 939 (1985); *Ueland v. Reynolds Metal Co.,* 103 Wash.2d 131, 691 P.2d 190 (1984) (en banc); *Theama, supra; see also Smith v. City of Fontana,* 818 F.2d 1411 (9th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987) (children's interest in the continued companionship and society of a parent is a cognizable liberty interest under the due process clause of the Fourteenth Amendment; thus, family relationship is protected from State interference); *Kelly v. T.L. James Co.,* 603 F.Supp. 390 (W.D.La.1985) (loss of society and services suffered by a child with an injured parent is a compensable injury under general maritime law). *But see In re Air Crash at Dallas/Fort Worth Airport,* 856 F.2d 28 (5th Cir.1988) (asserting that the Supreme Court of Texas, despite its decision in *Salinas, supra,* would not recognize the cause of action); *Sanders v. Mt. Sinai Hosp.,* 21 Ohio App.3d 249, 487 N.E.2d 588 (1985) (Ohio intermediate appellate court declined to recognize the cause of action).[3] Virtually all

---

**3.** As the cases cited in the text to which this footnote is appended demonstrate, the majority is incorrect in asserting that only six states have adopted the cause of action at common law. The majority accurately states that more courts have rejected the cause of action than have adopted it—despite some decisions that have perceived an "emerging trend" in favor of the minority view. *See Hibpshman v. Prudhoe Bay Supply, Inc.,* 734 P.2d 991, 992–993 n. 6 (Alaska 1987); *see also Beikmann v. International Playtex, Inc.,* 658 F.Supp. 255, 258 (D.Colo.1987). The majority opinion is further supported by *Durepo v. Fishman,* 533 A.2d 264 (Me.1987). The resolution of these differing views should not be accomplished by counting noses, however, but by examining the reasoning underlying each side of the issue.

modern commentators advocate recognition of a cause of action for loss of parental consortium.[4]

Maryland presently permits a minor child to recover nonpecuniary losses including "damages for mental anguish, emotional pain and suffering, *loss of society, companionship, comfort, protection,* marital care, *parental care, filial care, attention, advice, counsel, training, guidance,* or *education*" in a wrongful death action when a parent is killed. Md.Ann.Code (1984 Repl.Vol.), Cts. & Jud.Proc. Art., § 3–904(d) [emphasis added].[5] "The state of the law in this area is anomalous in that a child may recover for loss of consortium if [a] parent dies as a result of another's negligence, but not if the severely injured parent remains alive but in a vegetative state." *Ueland, supra,* 103 Wash.2d at 134, 691 P.2d at 192; *see also Hibpshman, supra,* 734 P.2d at 994 n. 10 ("when the parent is not so severely injured as to be in a vegetative state; the amount of loss of consortium damages will reflect the degree of the child's loss").

An additional anomaly occurs in permitting a spouse (or spouses), and not a minor child, to recover for loss of consortium. A minor child, as noted by the Supreme Court

4. *See, e.g.,* W. Prosser, *The Law of Torts* § 125, at 935–936 (W. Keeton 5th ed. 1984); Love, *Tortious Interference With the Parent–Child Relationship: Loss of an Injured Person's Society and Companionship,* 51 Ind.L.J. 590 (1976); Note, *The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent,* 56 B.U.L.Rev. 722 (1976); Comment, *The Child's Claim for Loss of Consortium Damages: A Logical and Sympathetic Appeal,* 13 San Diego L.Rev. 231 (1975); Comment, *The Child's Cause of Action for Loss of Consortium,* 5 San.Fern.V.L.Rev. 449 (1977); Note, *Compensating the Child's Loss of Parental Love, Care, and Affection,* 1983 U.Ill.L.Rev. 293; Note, *Child's Right to Sue for Negligent Disruption of Parental Consortium,* 22 Washburn L.J. 78 (1982); *see generally* Annotation, *Child's Right of Action for Loss of Support, Training, Parental Attention, or the Like, Against a Third Person Negligently Injuring Parent,* 11 A.L.R.4th 549 (1982).

5. It is particularly noteworthy that the "sexual" aspect of consortium is only one element of the enumerated list of noneconomic damages (marital care) in a wrongful death action.

of Iowa, is likely to incur a greater injury than a spouse when a parent is physically injured.

"Since the child in his formative years requires emotional nurture to develop properly, the loss of love, care and companionship is likely to have a more severe effect on him than on an adult; and society has a strong interest in seeing that the child's emotional development proceeds along healthy lines. Moreover, an adult is in a better position than a child to adjust to the loss of a family member's love, care and companionship through his own resources. He is capable of developing new relationships in the hope of replacing some of the emotional warmth of which he has been deprived. A child, however, is relatively powerless to initiate new relationships that might mitigate the effect of his deprivation. Legal redress may be the child's only means of mitigating the effect of his loss."

*Weitl, supra,* 311 N.W.2d at 269 (quoting Note, *The Child's Right to Sue,* 56 B.U.L.Rev. at 742).

Recognition of this cause of action for a minor child would also be consistent with this Court's view of the importance of a stable and harmonious family. *See Frye, supra.* Injury to a parent by the tortious act of a third party clearly is an interference with that stability and harmony. *See Leach, supra,* 628 F.Supp. at 303 ("destruction of the family harmony and tranquility" results from negligence of third party).

The majority opposes the recognition of this cause of action because of the inadequacy of money damages and the speculative nature of recovery. 316 Md. at 30, 557 A.2d at 217. It enlists the aid of the Supreme Court of California which has said:

Loss of consortium is an intangible, nonpecuniary loss; monetary compensation will not enable plaintiffs to regain the companionship and guidance of a mother.... To say that plaintiffs have been 'compensated' for their loss is superficial....

*Borer v. American Airlines, Inc.,* 19 Cal.3d 441, 447, 563 P.2d 858, 862, 138 Cal.Rptr. 302, 306 (1977) (en banc). This, however, is an inevitable shortcoming of our tort system. Money damages are "the only workable way that our legal system has found to ease the injured party's tragic loss" in this circumstance and in many other areas of tort law. *Theama, supra,* 117 Wis.2d at 523, 344 N.W.2d at 520; *see also Hay, supra,* 145 Vt. at 541, 496 A.2d at 944. The legislature in enacting § 3-904(d) of the Courts and Judicial Proceedings Article has signified its approval of an award of monetary damages to recover for nonpecuniary losses. And although the nature of the recovery is speculative, it is no more speculative than the solatium recovery presently permitted in wrongful death, or in any award involving pain and suffering, personal injury, or emotional distress. *See, e.g., Hay,* 145 Vt. at 541, 496 A.2d at 943-944; *see also* C. McCormick, *Handbook on the Law of Damages* § 27, at 102 (1935) (it is a perversion of justice to deny relief to an injured plaintiff solely because damages are speculative).

The majority also is concerned about the "expansion of consortium-type claims...." 316 Md. at 31, 557 A.2d at 217. It fears "the substantial expansion of tortfeasor liability and the accompanying societal costs that will be imposed by this new cause of action." *Id.* But precisely the same apprehensions arise when a child seeks consortium damages for the wrongful death of a parent; they did not deter the legislature in the wrongful death context. And in any case, these concerns can be addressed. As to the "societal costs" (*i.e.,* insurance costs) even if we speculate that premiums will increase solely because the new cause of action is recognized, that fact alone is not reason enough to deny recovery to a class of plaintiffs that deserves a remedy consistent with the public policy of this State. As the Supreme Court of Michigan has reasoned:

> Recognizing the child's cause of action may result in increased insurance costs, but compensating a child who has suffered emotional problems because of the depriva-

tion of a parent's love and affection may provide the child with the means of adjustment to the loss. The child receives the immediate benefit of the compensation, but society will also benefit if the child is able to function without emotional handicap. This may well offset any increase in insurance premiums.

*Berger, supra,* 411 Mich. at 15, 303 N.W.2d at 426.

As to the supposed problem of multiple litigation, I would hold that a child's loss of parental consortium must be joined with the injured parent's claim for damages (as in the case of loss of spousal consortium) whenever feasible. In order to bring a separate action, the child would have to show why joinder was not feasible. *See Weitl,* 311 N.W.2d at 270; *Ueland,* 103 Wash.2d at 140, 691 P.2d at 194. Moreover, I would limit the cause of action to loss of parental consortium by a minor child, thereby paralleling the statutory remedy in wrongful death cases. And I would limit the child's recovery to loss of society and companionship. This would preclude any double recovery for the parent's lost wages; the parent could recover for those as part of his or her claims against the tortfeasor, if appropriate. *See Hibpshman,* 734 P.2d at 996; *Theama,* 117 Wis.2d at 526, 344 N.W.2d at 551–552.

In summary, I am convinced that public policy calls for establishment of a cause of action for a child's loss of parental consortium when the parent has been tortiously injured by a third party. I would reverse.